UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAMES GUZMAN,

        Petitioner,

v.                                  CASE NO. 6:06-cv-1271-Orl-35GJK

SECRETARY, DEPARTMENT OF
  CORRECTIONS, et al.,

        Respondents.

_____/

## ORDER

      This case is before the Court on the Petition for Habeas Corpus Relief and accompanying memorandum of law (Doc. No. 1) filed by James Guzman. Pursuant to the instructions of the Court, Respondents filed a Response (Doc. No. 22) to the Petition for Writ of Habeas Corpus. Thereafter, Petitioner filed a Reply to the Response (Doc. No. 36). As discussed hereinafter, the habeas petition is granted in part and denied in part.

## I.    STATEMENT OF THE FACTS

      Petitioner was arrested for the murder of David Colvin on December 13, 1991. Petitioner's second trial began on December 2, 1996, and, in this trial, Petitioner waived his right to a jury in both the guilt and penalty phases of the trial.[1] The trial court convicted

---

[1]Petitioner was originally indicted on January 7, 1992, and, on September 25, 1992, the jury found Petitioner guilty of robbery with a deadly weapon and first degree murder. (Exhibit G-5 at 583.) On September 25, 1992, the jury recommended the death penalty, and, on October 16, 1992, Petitioner was adjudicated guilty and sentenced to death on the murder conviction and to life imprisonment on the robbery conviction. *Id.* The Supreme Court of Florida reversed the convictions and remanded for a new trial due to conflicts of interest between Petitioner and other clients of the public defender's office. *See Guzman v. State*, 644 So. 2d 996 (Fla. 1994).

Petitioner of first-degree murder and armed robbery, and it imposed a death sentence. In its sentencing order, the trial court found the following five aggravating circumstances: (1) Petitioner was previously convicted of a felony involving the use of violence; (2) the murder was committed in the course of a robbery; (3) the murder was committed for the purpose of avoiding arrest; (4) the murder was committed in a cold, calculated, and premeditated manner; and (5) the murder was especially heinous, atrocious, or cruel. The trial court found no statutory mitigating circumstances, and, as nonstatutory mitigation, the trial court found that Petitioner's alcohol and drug dependency was established but that it was entitled to little weight. *Guzman v. State,* 721 So. 2d 1155, 1157-58 (Fla. 1998).

While the murder was indisputably heinous,[2] the facts centrally at issue here are

---

[2]The record of Petitioner's second trial reflects the following facts:

David Colvin's body was discovered lying face down on the bed of his motel room on August 12, 1991. He had nineteen stab, incised, and hack wounds to his face, skull, back, and chest, and a defensive wound to a finger on his left hand. A skull fragment was found on the floor at the foot of the bed. Colvin's bed was soaked in blood and a large amount of blood spatter coated the walls of the room within two to three feet of the body. A bent and twisted samurai sword was found on a light fixture above the bed. No blood or fingerprints were found on the sword. However, Guzman's fingerprints were found on the telephone in the room. Colvin's blood alcohol level was determined to be .34 at the time of his death.

Dr. Terrance Steiner, the interim medical examiner for Volusia County, viewed the murder scene. Dr. Steiner testified that the weapon used to kill Colvin was a single-edged knife or knife-like object with a slightly curved, heavy blade. He stated that the incised wounds to Colvin's face and skull were consistent with a blade being drawn over an area rather than stabbed into it. Dr. Steiner testified that the defensive wound was the type suffered by a person attempting to block a blow with his hand. He further testified that the sword recovered from the room could have inflicted some of the wounds to Colvin's body, and that a survival knife like the one owned by Guzman could have inflicted other wounds. Dr. Steiner said that Colvin died as a result of loss of blood and that none of his wounds would have been

those concerning the presentation of evidence of Petitioner's guilt as the perpetrator of the

murder. In this regard, the facts adduced at trial, as set forth by the Supreme Court of

Florida, are as follows:

> Approximately one week prior to the murder, Guzman and Martha Cronin, a prostitute and crack cocaine addict, began living together at the Imperial Motor Lodge. Colvin also resided at the motel, and Guzman and Colvin became acquainted. On the morning of August 10, Colvin and Guzman left the hotel in Colvin's car. Guzman and Colvin first proceeded to a tavern and drank beer, then the men went to the International House of Pancakes and ate breakfast. Guzman testified that he and Colvin returned to the motel at approximately 12 noon. Guzman stated that he gave Colvin's car and room keys back to Colvin and returned to his room. Guzman testified that at approximately 3 p.m. Curtis Wallace gave him a diamond ring that he could sell or trade for drugs. Guzman admitted that he gave the ring to Leroy Gadson in exchange for drugs and money. However, Guzman denied any involvement in Colvin's robbery and murder.

> Cronin's trial testimony contradicted Guzman's. Cronin testified that Guzman told her prior to the murder that Colvin would be easy to rob because he was always drunk and usually had money. Cronin stated that Guzman told her in another conversation that if he ever robbed anybody, he "would have to kill them" because "a dead witness can't talk." Cronin testified that Guzman was holding his survival knife at the time this statement was

---

> immediately fatal. Based on the pattern of the wounds and the defensive wound, Dr. Steiner opined that Colvin was conscious during at least the onset of the attack. Dr. Steiner said that the fact that Colvin was intoxicated at the time of the attack did not affect his opinion that Colvin was conscious during the assault and attempting to defend himself. Dr. Steiner estimated that Colvin died between 3 p.m. and midnight on August 10.

> Leroy Parker, a crime scene analyst with the Florida Department of Law Enforcement (FDLE), testified that the blood stains found in the room indicated that most of Colvin's wounds were inflicted while he was lying on the bed in a defensive position with his head elevated within a distance of twelve inches from the bed. Parker further testified that the large amount of blood spatter on the walls of the room suggested that the killer was swinging the weapon. Parker stated that the sword found at the crime scene was consistent with the blood spatter evidence.

*Guzman*, 721 So. 2d at 1157.

made. Cronin claimed that, on the morning of August 10, Guzman told her that he was going to drive Colvin to the bank. Cronin stated that Guzman returned to their room that morning and showed her Colvin's car keys and room keys. Cronin testified that at approximately 3 p.m. Guzman appeared at their room with a garbage bag that contained rags. Cronin said that Guzman looked upset, and that she asked him what was wrong. Cronin testified that Guzman responded, "I did it," and confessed to murdering Colvin. Cronin stated that Guzman told her that Colvin awakened while he was taking money from Colvin's room. Cronin testified that Guzman said that he hit Colvin in the head and then stabbed him with the samurai sword. Cronin stated that Guzman showed her a diamond ring and money that he had taken from Colvin. Cronin also stated that Guzman said he committed the murder for her.

Upon questioning by the police shortly after the discovery of Colvin's body, Guzman and Cronin both claimed to know nothing about the murder. In the latter part of November 1991, Cronin informed the police that Guzman had confessed to her that he killed Colvin. Cronin testified that Guzman had instructed her to tell the police that she knew nothing about the murder. Cronin also testified that she did not come forward earlier because Guzman threatened to harm her if she revealed what she knew about the crime. Guzman admitted that he told Cronin prior to his first trial to "do the right thing girl-it's a small world." Paul Rogers and Guzman became friends while sharing a jail cell in the Spring of 1992. Rogers testified that Guzman confessed to him that he robbed and killed Colvin. Rogers said that Guzman told him that he used Colvin's key to enter his room after the men returned from drinking, and that Colvin awakened while Guzman was robbing him. Rogers further testified that Guzman stated that, after Colvin sat up in the bed, Guzman struck Colvin ten or eleven times with the sword. Rogers stated that Guzman said he cleaned the sword and put "everything" in a garbage bag which he disposed of in a dumpster. Rogers also stated that Guzman admitted that he took Colvin's ring and some money and traded the ring for drugs. Guzman allegedly told Rogers that he robbed and killed Colvin so Cronin would not have to earn money as a prostitute. Rogers said that Guzman threatened to kill him and his family if he informed the police about his knowledge of the murder.

*Guzman*, 721 So. 2d at 1157-58.

Here Petitioner raises meritorious *Giglio*[3] and *Brady*[4] claims involving the false

---

[3]*Giglio v. United States*, 405 U.S. 150 (1972).

[4]*Brady v. Maryland*, 373 U.S. 83 (1963).

testimony of Martha Cronin and the false testimony of Detective Allison Sylvester and the withholding of evidence from the Defense concerning same. The following are the facts significant to the consideration of this claim on this Petition.

At trial, Detective Sylvester testified that she questioned Ms. Cronin on August 12, 1991, and that Ms. Cronin failed to offer any information pertaining to the case. (Exhibit AA-19 at 1501, 1520). On September 24, 1991, Ms. Cronin was questioned by Detective Sylvester and, again, she denied any information about the homicide. *Id*. at 1530.[5] On November 24, 1991, Ms. Cronin provided a statement late on November 23, 1991, and into November 24, 1991, near midnight implicating Petitioner as the perpetrator of the homicide. *Id*. at 1503-05, 1531. Ms. Cronin had an active warrant for her arrest on November 24, 1991, due to an outstanding warrant for violation of probation. *Id*. at 1531, 1549-50. Ms. Cronin was seeking a "deal," but the assistant state attorney handling the case instructed Detective Sylvester to arrest. Detective Sylvester rejected this directive and did not arrest Ms. Cronin. *Id*. at 1531-32. Instead, Ms. Cronin was taken to a hotel and provided with food, which was paid for by the Daytona Beach Police Department, in order to keep "an eye on her while [they] finished following up on information." *Id*. at 1532-33, 1551. However, Ms. Cronin left the hotel on November 24, 1991, without permission, and law enforcement lost contact with her. *Id*. at 1533-34. Ms. Cronin engaged in prostitution and used crack cocaine after she left the hotel. *Id*. at 1533, 1668.

Detective Sylvester then arrested Ms. Cronin on November 27, 1991, for outstanding warrants for violation of probation. *Id*. at 1533, 1549. When Ms. Cronin was arrested on November 27, 1991, Detective Sylvester was afraid that Ms. Cronin would flee, and Detective Sylvester admitted that Ms. Cronin was arrested because she was the prime witness and was needed for the case. *Id*. at 1552. Ms. Cronin was, nevertheless, released from jail on December 5, 1991. *Id*. at 1558. Petitioner was arrested on December 13, 1991. *Id*. at 1502.

Ms. Cronin testified before the grand jury against Petitioner on January 11, 1992. (Exhibit AA-21 at 1743.) At the trial, Detective Sylvester denied that she, law enforcement, or the State Attorney's office had offered Petitioner any deals in exchange for her testimony. (Exhibit AA-20 at 1559-60.) Ms. Cronin also denied ever receiving a deal from law enforcement,

_____

[5]Ms. Cronin confirmed in her trial testimony that she told law enforcement on August 12, 1991, and on September 24, 1991, that she knew nothing about the homicide. (Exhibit AA-21 at 1732.)

although she acknowledged being placed in a hotel room for protection. *Id*. at 1667-68.

At the Rule 3.850 evidentiary hearing, however, after defense investigation had revealed a payment had been made to Ms. Cronin, Detective Sylvester conceded that, on January 3, 1992, just eight days before Ms. Cronin testified before the grand jury she delivered a money order to the Volusia County Jail in the sum of $500 made payable to Ms. Cronin. (Exhibit G-2 at 166.) The money was placed in Ms. Cronin's prison account where she was incarcerated and was provided to her because she had provided information leading to the arrest of Petitioner. *Id*. at 167-70, 183. Detective Sylvester denied that Ms. Cronin was paid for her testimony. *Id*. at 180. Detective Sylvester could not recall when the reward money had first been offered to Ms. Cronin. *Id*. at 168. However, the reward was originally offered on August 16, 1991, for information "about a man stabbed to death in his motel room." *Id*. at 185. The reward offer was published in the Daytona Beach News-Journal and the Orlando Sentinel. *Id*. at 199-200. Detective Sylvester recalled that Ms. Cronin's mother contacted her on January 2, 1992, "asking if it were possible for [Detective Sylvester] to obtain the reward money to get it to [Ms. Cronin] in case she got out when she went to court that day." *Id*. at 197. Detective Sylvester testified that she had not disclosed to the prosecuting attorney the $500 reward paid to Ms. Cronin. *Id*. at 169. The prosecutor denied any knowledge of the $500 reward. *Id*. at 135.

It is this false testimony, unwittingly presented by the prosecution due to the false statements of its lead detective whose knowledge and statements are imputed to the prosecution that compel the reversal of this conviction. As the Supreme Court of Florida just recently confirmed citing controlling federal constitutional standards:

This result is compelled by the applicable case law of both the United States Supreme Court and this Court. This case law is based on the principle that society's search for the truth is the polestar that guides all judicial inquiry, and when the State knowingly presents false testimony or misleading argument to the court, the State casts an impenetrable cloud over that polestar. The United States Supreme Court explained as follows: "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair . . . [for it] involve[s] a corruption of the truth-seeking function of the trial process." *United States v. Augurs*, 427 U.S. 97, 103-04, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The rationale underlying this principle is timeless:

[I]f a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured[,] [s]uch a contrivance by a State to procure the conviction and imprisonment of a defendant is . . . inconsistent with the rudimentary demands of justice . . . .

*Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction [is] implicit in any concept of ordered liberty . . . ." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In other words, whenever the State seeks to obfuscate the truth-seeking function of a court by knowingly using false testimony or misleading argument, the integrity of the judicial proceeding is placed in jeopardy.FN1

> FN1. *See, e.g., United States v. Bagley*, 473 U.S. 667, 680, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("[T]he knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves 'a corruption of the truth-seeking function of the trial process.' "); *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("[T]his Court [has] made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' "); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.' "); *Guzman v. State*, 868 So.2d 498, 507 (Fla.2003) ("[T]he knowing use of perjured testimony involves prosecutorial misconduct and 'a corruption of the truth-seeking function of the trial process.' ").

*Johnson v. State,* 2010 WL 121248, at *1 (Fla. January 14, 2010).

## II.  PROCEDURAL HISTORY

On December 27, 1996, after a bench trial before the state court, Petitioner was found guilty of first degree murder (count one) and armed robbery with a deadly weapon

(count two).  (Ex. A-3 at 448-49.)[6]  The trial judge sentenced Petitioner to death as to the murder count and to life imprisonment as to the armed robbery count, with the sentences to run consecutively.  *Id*. at 450-54.

On direct appeal, Petitioner raised eight claims.  (Ex. B.)  The Supreme Court of Florida affirmed Petitioner's convictions and sentences.  *Guzman v. State*, 721 So. 2d 1155 (Fla. 1998).  Petitioner filed a petition for writ of certiorari with the United States Supreme Court, which was denied.  *See Guzman v. Florida*, 526 U.S. 1102 (1999).  (Ex. F-3.)

On March 27, 2000, Petitioner filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850.  (Ex. G-4 at 392-416.)  On November 30, 2000, Petitioner filed an amended Rule 3.850 motion, raising eleven claims.  *Id*. at 417-77.  On July 19, 2001, the trial court entered an Order that 1) scheduled an evidentiary hearing as to claims II C(1), II E (1), II E (4), II E (5), II G, III B (1), III C, IV B, V C, and XI, and 2) denied the remaining claims.  (Ex. G-5 at 583-609.)  On October 15, 2001, Petitioner filed a second amended Rule 3.850 motion, adding three additional claims (claims XII, XIII, and XIV).[7]  (Exhibit G-7 at 839-43.)  After an evidentiary hearing, the trial court denied claims II C(1), II E (1), II E (4), II E (5), II G, III B (1), III C, IV B, V C, and XI, as well as the claims raised in the second amended Rule 3.850 motion (claims XII, XIII, and XIV).  (Ex. G-8 at

---

[6]References to the record will be made by citing to the particular volume and page of the advanced appendix.  For example, "Ex. A at 1" refers to page one of the volume labeled Exhibit A.

[7]During the pendency of his amended Rule 3.850 motion, Petitioner filed a motion for DNA testing of a clump of hair recovered from the back of the victim's thigh at the murder scene.  The State filed a response stating that the hair evidence had been destroyed in November 1992.  Petitioner filed his second amended Rule 3.850 motion to add three claims related to the destruction of the hair evidence.

920-41.)  Petitioner appealed the denial to the Supreme Court of Florida and also filed a

petition for writ of habeas corpus.  Petitioner raised four claims with regard to the Rule

3.850 appeal[8] and two claims in his petition for writ of habeas corpus.  The Supreme Court

of Florida remanded Petitioner's *Giglio* claim to the trial court for application of the *Giglio*

standard to the facts and denied the remaining claims in both the appeal and the petition

for writ of habeas corpus.  *Guzman v. State*, 868 So. 2d 498 (Fla. 2003).

On September 22, 2004, the trial court entered an order denying the *Giglio* claim.[9]

(Exhibit N at 152-72.)  The Supreme Court of Florida affirmed the denial of relief.  *See*

*Guzman v. State*, 941 So. 2d 1045 (Fla. 2006).

III.    **GOVERNING LEGAL PRINCIPLES**

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28

U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA").  *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353

---

[8]Petitioner asserted that the trial court erred in denying four claims:  1) the State committed a *Giglio* violation by permitting false testimony at trial denying that a witness for the State was paid for her testimony against Petitioner; 2) the State committed a *Brady* violation by failing to disclose to the defense the State's $500 payment to a witness for the State; 3) the State destroyed potentially exculpatory DNA evidence (a clump of hair from the crime scene) in bad faith; and 4) Petitioner was denied a fair trial due to the prosecutor presenting misleading evidence and improper argument.

[9]Judge William C. Johnson, Jr. presided over both the guilt and penalty phases of Petitioner's second trial.  Judge Johnson was the sole fact-finder in both phases of the trial, since Petitioner's waived his right to jury in both phases of the trial.  (Exhibit N at 81.) Judge Johnson also presided over the postconviction evidentiary hearing and issued the order denying relief.  *Id*.  When the case was remanded by the Supreme Court of Florida for further proceedings on the *Giglio* claim, an order was entered by Judge Julienne Piggotte calling then Senior Judge Johnson out of retirement to handle and dispose of the case on remand.  *Id*. at 81-82.  Petitioner filed an objection to the assignment, *id*. at 83-95, but Judge Piggotte entered an order reaffirming the appointment.  *Id*. at 96.

F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

**A.      Standard of Review Under the AEDPA**

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Schwab v. Crosby*, 451 F.3d 1308, 1324 (11th Cir. 2006) (stating that the federal law relevant to this analysis is the United States Supreme Court precedent "in existence at the time the conviction became final"), *cert. denied*, 127 S. Ct. 1126 (2007).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent

considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

**B.  Standard for Ineffective Assistance of Counsel**

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and

(2) whether the deficient performance prejudiced the defense.[10]  *Id*. at 687-88.  A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Id*. at 689-90.  "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.  Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight.  *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy.  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).  Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

Additionally, it is well established that a defendant has the right to effective counsel on appeal.  *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984).  The Eleventh Circuit Court of Appeals has applied the United States Supreme Court's test for ineffective

---

[10]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

assistance at trial to guide its analysis of ineffective assistance of appellate counsel claims. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987). Thus, in order to establish ineffective assistance of appellate counsel, Petitioner must show (1) that counsel's performance was deficient and "fell below an objective standard of reasonableness" and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

## C. Exhaustion and Procedural Default

One procedural requirement set forth in the AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless the petitioner has exhausted all means of available relief under state law. 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-22 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> (A)    the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)    (i)    there is an absence of available State corrective process; or
>
>          (ii)    circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

Thus, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In addition, a federal habeas court is precluded

13

from considering claims that are not exhausted but would clearly be barred if returned to state court. *Id*. at 735 n.1 (stating that if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

In order to satisfy the exhaustion requirement, a state petitioner must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard*, 404 U.S. at 275-76) (internal quotation marks omitted). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998). The United States Supreme Court has observed that "Congress surely meant that exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992). Furthermore, the Court explained:

> [c]omity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claims on the merits.

*Id*.; *see also Henderson*, 353 F.3d at 898 n.25 ("Both the legal theory and the facts on which the federal claim rests must be substantially the same for it to be the substantial equivalent of the properly exhausted claim.").

Procedural default will be excused only in two narrow circumstances. First, a

petitioner may obtain federal review of a procedurally defaulted claim if he can show both "cause" for the default and actual "prejudice" resulting from the default. "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To establish "prejudice," a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson*, 353 F.3d at 892 (citations omitted).

The second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, in which a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, "'[t]o be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324).

## IV.    MERITS OF THE PETITION

## A.    Claim One

Petitioner claims that there was both a *Giglio* violation and a *Brady* violation. As to the *Giglio* violation, Petitioner argues that Ms. Cronin and the lead detective in this case both testified falsely at trial that Ms. Cronin received no benefit for her testimony against

Petitioner, other than being taken to a motel rather than to a jail when she was arrested. As to the *Brady* violation, Petitioner argues that the State failed to disclose that Ms. Cronin received a $500 reward for her testimony.

Detective Sylvester testified at trial that, on November 23, 1991, Ms. Cronin provided her with information about the case, which included Petitioner's confession. (Exhibit AA-19 at 1503; 1531.) As a result of that information, Detective Sylvester was able to locate the ring stolen from Mr. Colvin. *Id*. at 1504. Leroy Gadsen was in possession of the ring, and he identified Petitioner as the person who provided the ring to him in exchange for drugs and cash. *Id*. Detective Sylvester then spoke with Petitioner, and he voluntarily provided her with a knife in his possession. *Id*. at 1505-06. Since the knife fit the description of the weapon used in the murder, she sent the knife to the laboratory for analysis. *Id*. at 1506. Ms. Cronin then provided additional information to Detective Sylvester about the murder, and Petitioner was arrested a short time later. *Id*. at 1509-10; 1513.

Detective Sylvester acknowledged that Ms. Cronin was provided with a hotel room and food after giving her statement. *Id*. at 1532; Exhibit AA-20 at 1549, 1551.[11] Ms. Cronin was placed in a hotel room so that law enforcement could "keep an eye on her" and in an effort to ensure her safety; however, Ms. Cronin left the hotel room the next day without permission and was taken back into custody on November 27, 1991. Exhibit AA-19 at 1533; Exhibit AA-20 at 1549, 1563. Detective Sylvester denied that law enforcement or the State Attorney's Office had offered any deals to Ms. Cronin in exchange for her

---

[11]There was an active warrant for Ms. Cronin's arrest; however, Ms. Cronin was released to the hotel room instead of being taken to jail. *Id.* at 1536.

testimony.  (Exhibit AA-20 at 1560.)

Ms. Cronin testified at trial that she contacted Detective Sylvester regarding information about the murder.  *Id*. at 1667.  She denied ever getting a deal from law enforcement, although she acknowledged being placed in a hotel room for protection.  *Id*. at 1667-68.

### 1.    *Giglio violation*

Petitioner claims that the state courts erred in finding that the undisclosed $500 reward to Ms. Cronin was not material under *Giglio*.  This issue was raised in Petitioner's amended Rule 3.850 motion and was denied.  The trial court, relying in part on *Ventura v. State*, 794 So. 2d 553 (Fla. 2001), found that there was not a "reasonable probability that the false evidence would put the whole case in such a different light as to undermine the confidence in the verdict."  (Exhibit G-8 at. 931.)  The Supreme Court of Florida found that its precedent with regard to *Brady* and *Giglio* issues lacked clarity, which resulted in "some confusion and merging of the *Giglio* and *Brady* materiality standards."  *Guzman*, 868 So. 2d at 506.  The Supreme Court then clarified the two standards and determined that "the proper question under *Giglio* is whether there is any reasonable likelihood that the false testimony could have affected the court's judgment as the fact-finder in this case."  *Id*. at 507-08.[12]  Thus, this issue was remanded to the trial court for reconsideration and for clarification of its ruling on the materiality prong of Petitioner's *Giglio* claim.

---

[12]The Supreme Court of Florida found that the trial court had not sufficiently reflected the standard appropriate to a *Giglio* claim because of the following: 1) it did not state that there was no reasonable likelihood that the false evidence regarding the $500 payment to Ms. Cronin could have affected the court's judgment as fact finder; and 2) the court did not find that the State had demonstrated that the false evidence was harmless beyond a reasonable doubt.  *Id*. at 507.

On remand, the trial court found that the State's $500 payment to Ms. Cronin was immaterial under *Giglio*. It determined that there was no reasonable likelihood that the false testimony could have affected the judgment of the court and that the State had met its burden of showing that the false evidence was harmless beyond a reasonable doubt. (Exhibit N at 169-70.) The Supreme Court of Florida affirmed, finding that the false statement did not meet the materiality prong of *Giglio*. *Guzman*, 941 So. 2d at 1049.

In order to prevail on a *Giglio* claim, it must be established that the prosecutor "knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony and that the falsehood was material." *Brown v. Head,* 272 F.3d 1308, 1317 (11th Cir. 2001). In the present case, although Detective Sylvester testified that she did not disclose the true facts to the prosecution, her knowledge of this evidence was imputed to the prosecutor. *See Bell v. Haley*, 437 F. Supp.2d 1278 1307 (M.D. Ala. 2005) (finding that "[e]ven when evidence known to police is never turned over to the prosecutors, knowledge of the evidence is imputed to the prosecutors for *Brady* purposes."). Thus, it must be determined if the false testimony was material.

For *Giglio* purposes, the falsehood is deemed to be material if "there is any reasonable likelihood that the false testimony could have affected the judgment." *Ferguson v. Secretary for Dept. of Corrections,* 580 F.3d 1183, 1208 (11th Cir. 2009) (quotation omitted) (citation omitted).[13] This standard of materiality is equivalent to the

_____

[13]In *Bagley v. Lumpkin*, 798 F.2d 1297 (9th Cir. 1986), a bench trial resulted in the defendant being acquitted on firearms charges and convicted of controlled substance violations. The defendant filed a section 2255 motion arguing that there was a *Brady* violation when the government failed to produce evidence material to the witnesses' credibility. The section 2255 motion was denied, and the trial judge noted that he was "in a unique position" of being able to know what effect the disclosure would have had on the

*Chapman v. California*, 386 U.S. 18, 24 (1967), "harmless beyond a reasonable doubt"

standard.  *See Ford v. Hall*,  546 F.3d 1326, 1332 (11th Cir. 2008).[14]

In evaluating the *Giglio* claim, the Supreme Court of Florida determined that there

was no reasonable possibility that the false testimony regarding the $500 reward could

have affected the judgment of the factfinder.  *Guzman*, 941 So. 2d at 1051.  The Supreme

Court of Florida stated that "[i]n the interest of greater clarity, the term `reasonable

---

proceedings.  The Ninth Circuit reversed, finding that a *Brady* violation had occurred.  The Supreme Court reversed the appellate court's decision and remanded the case back to the Ninth Circuit for a determination of whether the evidence was sufficiently material.  The Ninth Circuit again found that a *Brady* violation had occurred and found, in relevant part, as follows:

> The proper inquiry is an objective one: whether "the Government's failure to assist the defense by disclosing information that might have been helpful in conducting cross-examination" undermines confidence in the outcome of the trial.  Therefore, the district judge erred when, in ruling on the section 2255 motion, he stated that the disclosure of the contracts would not have affected his decision.  The inquiry is not how this or any other judge, as the trier of fact, would subjectively evaluate the evidence.  It is, rather, how the absence of the evidence objectively might have affected the outcome of the trial.

*Id.* at 1301 (citation omitted).  The Supreme Court of Florida found *Bagley* distinguishable because "[u]nlike *Bagley* . . . where the trial judge used his `unique position' as the trier of fact to reach his conclusion, the trial judge here made no such error in his analysis of the impact of the false testimony in this case."  *Guzman*, 941 So.2d at 1052 n.4.

[14]However, it is unclear whether the *Chapman* and *Giglio* standards are actually equivalent because, in *Ventura v. Attorney General, Fla.*, 419 F.3d 1269, 1279 n.4 (11th Cir. 2005), the Eleventh Circuit Court of Appeals compared the *Giglio* standard for materiality to the *Chapman* standard and found that, as a result of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "*Chapman* . . . has little application to a case before us on collateral review."  In *Occhicone v. Crosby*, 455 F.3d 1306 (11th Cir. 2006), the Eleventh Circuit Court of Appeals noted that there was a question as to whether the *Chapman* gloss on *Giglio* was appropriate for cases in light of *Brecht*, which held that the error must have had "a substantial and injurious effect or influence in determining the jury's verdict."  The appellate court chose not to decide the issue since it was irrelevant to the outcome of the case.  In the present case, the Court finds that, under either the *Chapman* or the *Brecht* standard, Petitioner is entitled habeas relief.

possibility' is preferable to `reasonable likelihood' . . . ." *Id.* at 1050. The Supreme Court of Florida further noted that, "[i]nherent in the above analysis is our conclusion that the State met its burden of establishing that the false testimony was harmless beyond a reasonable doubt." *Id.* at 1051.

The Court must decide whether, under 28 U.S.C. § 2254(d), the state court's conclusion was a reasonable application of clearly established federal law, as defined by the United States Supreme Court. The Supreme Court of Florida found that Petitioner had failed to demonstrate that there was any reasonable possibility that the false testimony could have affected the judgment of the trial judge because Ms. Cronin's credibility as a witness was amply impeached and because her testimony incriminating Petitioner was independently corroborated and supported at trial.

The Court agrees that there was impeachment evidence presented against Ms. Cronin. She was addicted to crack cocaine and had suffered memory loss as a result of her addiction, and she had been arrested multiple times for prostitution. (Exhibit AA-21 at 1683-85; 1710; 1713.) She acknowledged that an individual named Thomas Lane testified on her behalf during her violation of probation hearing seeking her release and that, with her knowledge, falsely told the court that he was her brother in an effort to gain her release. *Id.* at 1692-93. Evidence was also presented that Ms. Cronin was jealous of Petitioner's relationships with other women and was a "scorned woman" as a result of Petitioner's relationship with another woman. *Id.* at 1696, 1700, 1712.

Moreover, Ms. Cronin admitted initially lying to law enforcement when she denied knowing anything about the death of Mr. Colvin, *id.* at 1732, and that, at the time she gave

up Petitioner to law enforcement, she would have done absolutely anything to get out of jail. *Id*. at 1768. She further testified regarding charges against her that were dropped by the State as a result of her testimony in the initial trial against Petitioner and regarding her untruthfulness as to various other matters. *Id*. at 1692; 1702-05; 1738-39; 1743-47. Evidence was also elicited that, in exchange for her testimony against Petitioner, she received food, lodging, and the dismissal of pending criminal charges against her. *Id*. at 1734-39; 1743-49.

Nevertheless, it is clear that the State provided Ms. Cronin with a payment of $500, which is a significant sum to an admitted crack cocaine addict and prostitute. Ms. Cronin was the key witness in this case, and the credibility of her testimony was critical to the State's case against Petitioner. The $500 payment would have provided substantial and specific evidence of Ms. Cronin's motivation to lie against Petitioner. The $500 payment was more than just another avenue of impeachment against an already discredited witness. The fact that the lead detective and the lead witness twice denied the existence of the payment is at least a tacit admission that it was perceived to have relevance to a reasonable fact finder viewing the credibility of this witness.

More importantly though, neither the trial court on remand nor, therefore, the Supreme Court of Florida on review, addressed the impact of the inability to impeach Detective Sylvester concerning her denial that any payment had been provided to Ms. Cronin. Petitioner's counsel was never given the opportunity to impeach the detective concerning her false testimony with regard to the payment, or to impeach her regarding her having permitted the key witness to give false testimony under oath before the court in the trial proceeding. Certainly a reasonable, objective fact-finder would have considered such

testimony relevant to the evaluation of the evidence.

As lead detective, Detective Sylvester's impeachment would have impugned not only her veracity but the character of the entire investigation. Her false testimony had a bearing on her credibility as the lead detective in the case, demonstrating a bias against Petitioner for failing to reveal such information. Certainly, a rational and objective fact-finder would have been forced to consider the fact that 1) Ms. Cronin, one of the most important witnesses for the State, received a payment of $500; 2) Ms. Cronin testified falsely on at least two separate occasions[15] (before the grand jury and in the second trial) that she had not received any payment even though the payment was made just days before she was presented by the prosecution to the grand jury; and, 3) the lead detective in this case falsely testified on at least one occasion and permitted the key witness to perjure herself two times concerning the same payment.

The $500 payment would have been of special concern to the fact-finder since Ms. Cronin had previously and repeatedly denied any knowledge of the circumstances surrounding the murder. To the extent that the fact-finder might reasonably have been swayed in the belief that her testimony was not credible, this would have been corroborated further by testimony from Carmelo Garcia, who was an acquaintance of Ms. Cronin. He stated that Ms. Cronin told him that she had lied to law enforcement regarding Petitioner's involvement in the murder because there was an outstanding warrant for her arrest and she wanted to avoid being arrested. (Exhibit AA-23 at 2029, 2032.) Coupled with the impeachment of Detective Sylvester, this undisclosed evidence would have

_____

[15]The record does not establish whether Ms. Cronin and Detective Sylvester offered this same false testimony in the first trial of Petitioner.

necessarily been influential in the objective fact-finder's decision-making.  As a result, the Court finds that an objective fact-finder would have necessarily considered both the undisclosed evidence and the false testimony in evaluating the testimony of both important witnesses for the State.

The Court is cognizant of the finding of the Supreme Court of Florida that Ms. Cronin's testimony regarding Petitioner's guilt was independently corroborated and supported by other evidence.  Specifically it cited by example that, Paul Rogers, who was a cellmate of Petitioner, testified that Petitioner told him that he went into Mr. Colvin's room in order to rob him; that he was going through Mr. Colvin's dresser drawers; that Mr. Colvin woke up; and that he hit Mr. Colvin with a sword ten or eleven times.  (Exhibit AA-22 at 1905-08.)  However, Mr. Rogers was a seven-time convicted felon and later recanted, providing an affidavit under oath on August 26, 1992, stating that Petitioner "had never confessed to me about the case." *Id*. at 1930.  Further, Mr. Rogers was aware of and had access to Petitioner's court records about the case in his cell.  *Id*. at 1933.

Although there was also testimony that Petitioner possessed Mr. Colvin's ring and traded it in for drugs and money, Exhibit AA-19 at 1504 and Exhibit AA-20 at 1857, Petitioner testified that Ms. Cronin, whose credibility now lies in shambles, gave it to him and told him that Curtis Wallace, another suspect in the case, wanted to trade the ring "for some crack cocaine." (Exhibit AA-23 at 2112.)  Petitioner claims he believed that the ring belonged to Mr. Wallace, and Petitioner then sold the ring to Leroy Gadson for $250 and a quantity of cocaine, which he shared with Mr. Wallace and Ms. Cronin.  *Id*. at 2112-17, 2121-22.

In addition, the Supreme Court of Florida treated the medical examiner's testimony

23

as important. The medical examiner testified that the sword and Petitioner's survival knife were consistent with the type of weapon(s) that could have caused the type of wounds observed on the victim's body. (Exhibit AA-19 at 1429; 1459-60.) However, the medical examiner also testified that the victim's wounds were "consistent with *any* knife three to four inches at least in length or knife-like object" and that he was unable to identify the "exact weapon that may have inflicted a particular wound." (Exhibit AA-19 at 1416, 1447.) Thus, the evidence apart from Ms. Cronin's testimony was not overwhelming and was insufficient to render the false testimony of Ms. Cronin and the lead detective immaterial.

As such, the Court concludes that the false testimony was material, and there was a reasonable likelihood that the false testimony could have affected the trial court's judgment as the fact-finder in this case. Thus, Petitioner has shown that the false testimony was not harmless beyond a reasonable doubt and that it had a substantial and injurious effect or influence in determining the trial court's verdict.

The Supreme Court of Florida correctly identified *Giglio* as providing the standard for the adjudication of this issue; it further concluded that the false testimony was not material because of the substantial impeachment evidence against Ms. Cronin and because Ms. Cronin's testimony regarding Petitioner's guilt was independently corroborated and supported by other record evidence. Under the facts of this case and the applicable federal law, Petitioner has shown that the decision of the Supreme Court of Florida was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Likewise, Petitioner has shown that the decision of the Supreme Court of Florida was based on an unreasonable determination of the facts in light of the evidence presented. For this reason,

this issue is meritorious, and Petitioner is entitled to habeas relief on this claim.

2.    *Brady violation*

Petitioner claims that Ms. Cronin testified at trial that she received no benefit or deal for her testimony; that this testimony was knowingly false and made with the State's knowledge of its falsity; and that the State failed to correct the false testimony.  He states that Ms. Cronin received $500 in reward money from the State as compensation for her testimony and that the State withheld this impeachment evidence from Petitioner.

This issue was raised in Petitioner's amended Rule 3.850 motion, and, after the evidentiary hearing, the trial court denied the claim, finding that there was no reasonable probability that, had the information regarding the $500 reward paid to Ms. Cronin been disclosed to Petitioner, the result of the proceedings would have been different.  The Supreme Court of Florida affirmed the trial court's ruling, concluding that there was no reasonable probability that, had the reward evidence been disclosed, the outcome of the proceedings would have been different.  *Guzman*, 868 So. 2d at 508.

The Eleventh Circuit Court of Appeals has determined that in order to establish a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the petitioner must demonstrate the following:

> (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989).[16]

Petitioner has established the first three factors. First, the reward to Ms. Cronin was potentially favorable evidence to Petitioner as impeachment evidence against Ms. Cronin. Second, Petitioner did not possess the evidence, and he was unable to obtain it with any reasonable diligence. Finally, Petitioner requested this information from the State;[17] however, the State informed Petitioner that there were no "agreements, assurances of non-prosecution or leniency, offers, benefits, or understandings between the State of Florida and Martha Cronin." (Exhibit A-3 at 401.)

As to the materiality issue, the Court discussed above that, although Petitioner's counsel presented impeachment evidence against Ms. Cronin, Ms. Cronin was the key witness in this case, and the credibility of her testimony was critical to the State's case against Petitioner. It is clear that the State provided her with a payment of $500, which is a significant sum to an admitted crack cocaine addict and prostitute. Further, Petitioner's counsel was denied a fair opportunity to impeach Detective Sylvester as to her false testimony and acquiescence in the perjury of Ms. Cronin.

Certainly, a rational and objective fact-finder would have considered the fact that 1) Ms. Cronin, the most important witness for the State received a payment of $500, and 2) both Ms. Cronin and the lead detective in this case falsely testified that any compensation had been paid to Ms. Cronin. This matter would have been of particular concern to the

---

[16]The Court notes that claims arising under *Giglio* are a type of *Brady* claim that have a different and more defense-friendly measure of materiality. *Hammond v. Hall*, 586 F.3d 1289, 1306 (11th Cir. 2009).

[17]Petitioner sought, among other matters, any agreements or consideration given to any of the State's witnesses. (Exhibit A-1 at 134.)

fact-finder since Ms. Cronin had previously denied any knowledge of the circumstances surrounding the murder.  Consequently, the Court finds that an objective fact-finder would have necessarily considered both the undisclosed evidence and the false testimony in evaluating the testimony of both important witnesses for the State.

Further, although the Supreme Court of Florida also relied on its finding that Ms. Cronin's testimony regarding Petitioner's guilt was independently corroborated and supported by other evidence, the Court discussed above that such evidence was not overwhelming and was insufficient to render the false testimony of Ms. Cronin and the lead detective immaterial.

As such, the false testimony and the withholding of the evidence pertaining to the reward was material, and there was a reasonable probability that the false testimony and the evidence would have affected the trial court's judgment as the fact-finder in this case. Petitioner has demonstrated that the false testimony and the withholding of the evidence was not harmless beyond a reasonable doubt and that it had a substantial and injurious effect or influence in determining the trial court's verdict.

The Supreme Court of Florida correctly identified *Brady* as providing the standard for the adjudication of this issue; it further concluded that the false testimony was not material because of the substantial impeachment evidence against Ms. Cronin and because of other evidence apart from Ms. Cronin's testimony regarding Petitioner's guilt. Under the facts of this case and the applicable federal law, Petitioner has shown that the decision of the Supreme Court of Florida was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Likewise, Petitioner has shown that the decision of the Supreme Court of

27

Florida was based on an unreasonable determination of the facts in light of the evidence presented. For this reason, this issue is meritorious, and Petitioner is entitled to habeas relief on this claim.

**B.    Claim Two**[18]

Petitioner states that his retrial, which resulted when the Supreme Court of Florida reversed his original death sentence based on the trial court's failure to allow the public defender to withdraw based on a conflict of interest, *see Guzman v. State*, 644 So. 2d 996 (Fla. 1994), violated the Double Jeopardy provisions of the Constitution. Petitioner raised this claim on direct appeal, and the Supreme Court of Florida found the claim to be meritless. *See Guzman v. State*, 721 So. 2d 1155, 1159 n.3 (Fla. 1998).

Before Petitioner's first trial, the assistant public defender representing Petitioner filed a motion to withdraw, stating that Mr. Rogers, who was listed as a witness for the State, was also represented by the public defender's office. *Guzman v. State*, 644 so. 2d 996, 998 (Fla. 1994). Mr. Rogers was a cellmate of Petitioner and told the State that Petitioner confessed to him regarding the crimes in the instant proceedings. *Id*. The trial court denied the motion to withdraw; however, Mr. Rogers never testified against Petitioner in the first trial. *Id*. Shortly before trial, the State announced that it would be calling Arthur Boyne, another cellmate of Petitioner's, as a witness against Petitioner. *Id*. At that time,

---

[18]Although the Court has granted habeas relief as to claim one, the Eleventh Circuit Court of Appeals instructs that all claims for relief must be resolved regardless of whether habeas relief is granted or denied. *Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992). The purpose of such a rule is to avoid "piecemeal litigation," which threatens to undermine judicial economy, and the treatment of several alleged constitutional violations in a single proceeding "enhanc[es] the quality of the judicial product." *Id*. (quotation and citation omitted).

the assistant public defender representing Petitioner again filed a motion to withdraw because the public defender had represented Mr. Boyne in a previous case and was presently representing Mr. Boyne in a criminal appeal. *Id.* The trial court denied the motion, and Mr. Boyne testified at trial that Petitioner told him that he killed the victim. *Id.* The Supreme Court of Florida found that Mr. Boyne's testimony was significant; that an actual conflict of interest and prejudice had been shown; and that the denial of the motion to withdraw was reversible error. *Id.* at 999. Thus, Petitioner's convictions and sentences were reversed, and the case was remanded for a new trial. *Id.* at 1000.

Petitioner argues that the prosecutors called Mr. Boyne as a witness, even though they knew he was lying and that Petitioner's conviction would be reversed because of the conflict. According to Petitioner, the prosecutors did this in order to obtain leverage and pressure Mr. Rogers ultimately to testify in Petitioner's retrial . (Petitioner's Memorandum of Law at 54.) Petitioner also claims that the retrial enabled the medical examiner to expand the time-frame within which the murder occurred, thereby encompassing the time-frame that Ms. Cronin stated that Petitioner confessed to her. Thus, Petitioner states that, because of the prosecutorial misconduct, "double jeopardy bars retrial." *Id.* at 55.

The Fifth Amendment provides that "[n]o person shall ... be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V. The Fifth Amendment guarantee against double jeopardy consists of three constitutional protections. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717

(1969) (footnotes omitted), *overruled in part by Alabama v. Smith*, 490 U.S. 794 (1989).

Although the Double Jeopardy Clause bars successive prosecutions, it "is not an absolute bar to successive trials." *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 308 (1984). The constitutional prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside because of trial error in the proceedings leading to conviction. *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988); *see also Shute v. State of Tex.*, 117 F.3d 233, 238 (5th Cir. 1997) (holding that generally, "if a defendant obtains a reversal of his conviction, double jeopardy does not bar a retrial. If the conviction is reversed for insufficient evidence of guilt, however, double jeopardy does bar retrial. This is because a finding of insufficient evidence of guilt means that the trial court should have entered a judgment of acquittal, which would have barred retrial.") (citations omitted).

In the present case, Petitioner's initial conviction was reversed because of the Supreme Court of Florida's finding that the denial of the motion to withdraw was reversible error; it was not reversed based on insufficiency of evidence. Thus, there was no double jeopardy violation, and it was not error for the State to retry Petitioner.

Petitioner's assertion that there was prosecutorial misconduct that led to the mistrial is based on conjecture and is not supported by the record. Further, "[t]he law is settled that a mistrial requested by the defendant because of prosecutorial misconduct does not bar a retrial under double jeopardy principles, unless the prosecutor intentionally misbehaved for the specific purpose of goading the defendant into moving for the mistrial." *United States v. Jordan,* 429 F.3d 1032, 1034 (11th Cir. 2005). Here, there was no mistrial

requested by Petitioner, and there has been no showing that the prosecutor misbehaved, intentionally for the purpose of forcing a motion for mistrial. Consequently, this claim is denied.

## C.    Claim Three

Petitioner claims that he was denied due process of law by the State's bad faith destruction of exculpatory evidence--"Caucasian hair found lying on the back of [the victim's] thigh." (Petitioner's Memorandum of Law at 57.) He argues that the hair evidence was potentially exculpatory because, if DNA testing showed that the hair was not Petitioner's or the victim's, it would show that someone other than Petitioner killed the victim. According to Plaintiff, the State committed a *Brady* violation in failing to divulge that the hair evidence had been destroyed, and trial counsel was ineffective in failing to ascertain that this evidence had been destroyed. He further claims that the evidence custodian, Officer Francis Thompson of the Daytona Beach Police Department, who destroyed the evidence, is in federal prison for selling items stolen from the evidence room and that the State acted contrary to existing standards and procedures associated with the destruction of evidence in a homicide case.

This claim was raised in Petitioner's amended Rule 3.850 motion, and the trial court found that it was procedurally barred, and, alternatively, that Petitioner had not met his burden of showing bad faith in the destruction or loss of the hair evidence. The Supreme Court of Florida addressed the merits of the claim and found as follows: Petitioner did not demonstrate that any State actor intentionally deprived him of evidence that the State actor believed to be exculpatory; there was no *Brady* violation because Petitioner did not show

that the hair was evidence favorable to him; and trial counsel was not ineffective because he reasonably discounted the evidentiary value of the hair sample.

1. *Destruction of Evidence*

Petitioner has not established a due process violation with regard to the destruction of evidence. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 58 (1988). A determination of bad faith by the police "must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id. at n.*. A due process violation is not established when the evidence is only "potentially useful," and the actions of the police could "at worst be described as negligent." *Id*.

In the present case, Petitioner has not shown that the hair sample from the murder scene was exculpatory or that law enforcement officers believed that it might be exculpatory or acted in bad faith with regard to the destruction thereof. Detective Sylvester testified at the Rule 3.850 evidentiary hearing that she recalled seeing the hair on the thigh of the victim. (Exhibit G-2 at 202.) However, she felt that the hair was consistent with the victim's own hair. *Id*. In particular, she stated that "it appeared to me that the weapon that was used to make the wounds to the head had also cut this hair from the victim's head and had fallen off of the weapon onto the back of the victim . . . ." *Id*. at 203. Detective Sylvester did not feel that a hair analysis would have been significant to the case. *Id*. at 211. While Detective Sylvester's unilateral, non-scientific opinion would be fair grounds for impeachment on retrial, the Court does not find that it warrants reversal of

the Petitioner's conviction.

In a similar case, *Merck v. State*, 664 So. 2d 939 (Fla. 1995), the defendant argued that the failure of a detective to keep as evidence a pair of khaki pants located during the search of the vehicle abandoned by the defendant and his companion after the murder was a bad faith failure to preserve potentially exculpatory evidence, resulting in a denial of due process. The detective had concluded that the pants did not have evidentiary value and left the pants in the vehicle. The Supreme Court of Florida denied the claim, finding that the failure to preserve the khaki pants was not a denial of due process and that there had been no showing that the detective acted in bad faith in deciding not to preserve pants that had no blood stains.

Petitioner has not demonstrated that he was intentionally deprived of evidence that a State actor believed to be exculpatory. Thus, Petitioner has not established a due process violation. Under the circumstances, it cannot be said that the state court's denial of this claim was "contrary to, or involved an unreasonable application of, clearly established federal law" or was "based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d). As a result, Petitioner is not entitled to federal habeas relief on this issue.

2.    *Brady violation*

Petitioner has not established that the State committed a *Brady* violation by failing to disclose that the hair evidence had been destroyed. As discussed above, the Eleventh Circuit Court of Appeals has determined that in order to establish a *Brady* violation, the petitioner must demonstrate the following:

(1) that the Government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989). For purposes of *Brady*, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Stewart*, 820 F.2d 370, 374 (11th Cir. 1987) (quotation omitted). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110 (1976).

In the present case, Petitioner has failed to satisfy the first requisite element of a *Brady* violation: that the evidence was favorable to Petitioner. In particular, as discussed above, Petitioner has not demonstrated that the hair was evidence favorable to him. Additionally, as discussed above, Petitioner has not shown that the prosecution suppressed this evidence or that the outcome of the proceedings would have been different as a result of this evidence alone. Thus, Petitioner fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in denying relief on this issue.

*3.    Ineffective Assistance of Counsel*

Petitioner has not shown that counsel was deficient in failing to pursue the hair evidence so as to discover it had been destroyed before trial. At the Rule 3.850 evidentiary hearing, Petitioner's trial counsel, Gerard Francis Keating, testified that he thought the hair

belonged to the victim based on the wounds to the victim's skull. (Exhibit G-3 at 249.) Thus, Mr. Keating did not attribute much significance to the hair evidence. *Id.* at 301.

Mr. Keating's conclusion that the hair evidence may have come from the victim and that it was not significant to the case was reasonable. As discussed above, Detective Sylvester, the lead detective in this case, came to the same conclusion. Petitioner has not demonstrated, and this Court is unable to conclude, that the state court's decision was either "contrary to" or an "unreasonable application of" *Strickland*. Moreover, Petitioner has not demonstrated that the state court made an unreasonable determination of the facts in light of the evidence presented, and this issue is denied pursuant to section 2254(d).

**D.    Claim Four**

Petitioner claims that there was insufficient evidence to support the conviction. Petitioner essentially attacks the credibility of Ms. Cronin and Mr. Rogers, witnesses for the State and contends that the medical examiner's testimony was inconsistent. This claim was raised on direct appeal, and it was rejected by the Supreme Court of Florida.

The standard of review in a federal habeas corpus proceeding when the claim is that the petitioner has been convicted on insufficient evidence was articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), and described as follows:

> [W]hether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Id*. at 319. The "purpose of a *Jackson* analysis is to determine whether the jury acted in a rational manner in returning a guilty verdict based on the evidence before it, not whether

35

improper evidence violated due process . . . ." *McDaniel v. Brown,* 130 S. Ct. 665, 672 (2010) (quotation omitted) (citation omitted). Thus, when considering a *Jackson* claim, "a reviewing court must consider all of the evidence admitted by the trial court, *regardless* [of] whether that evidence was admitted erroneously." *Id*. (citation omitted) (quotation omitted) (emphasis added).

The following evidence was considered by the jury at trial. Ms. Cronin testified that Petitioner had told her that the victim "would be easy to rob. Because he was drunk all the time and usually had money." (Exhibit AA-20 at 1639.) Petitioner also told her that if he ever robbed anyone he would kill them because a "dead witness can't talk." *Id*. at 1640. Petitioner further informed her that he had killed Mr. Colvin, *id*. at 1652, and stated that Mr. Colvin woke up while Petitioner was in the process of robbing him and that he had "hit him in the head, knocked him out and then stabbed him with a samurai sword." *Id*. at 1654-55. Petitioner showed Ms. Cronin the ring and some cash he had taken from Mr. Colvin. *Id*. at 1655-56. Several months later, Petitioner again told Ms. Cronin that he had killed Mr. Colvin with a sword following a fight over money and that he had done it for her. *Id*. at 1658, 1664.

The testimony of Mr. Rogers was very similar to Ms. Cronin's. Mr. Rogers testified that Petitioner told him that he went into Mr. Colvin's room in order to rob him; that he was going through Mr. Colvin's dresser drawers; that Mr. Colvin woke up; and that he hit Mr. Colvin with a sword ten or eleven times. (Exhibit AA-22 at 1905-08.) Petitioner then cleaned up everything, including the sword, took Mr. Colvin's ring and $600, and returned to his room. *Id*. at 1908-09.

Testimony was also elicited that Petitioner possessed Mr. Colvin's ring and traded it in for drugs and money. (Exhibit AA-19 at 1504); (Exhibit AA-20 at 1857.) Further, the medical examiner testified that the sword and Petitioner's survival knife were consistent with the type of weapon(s) that could have caused the type of wounds observed on the victim's body. (Exhibit AA-19 at 1429; 1459-60.)

The evidence admitted by the trial court and considered by the jury was sufficient to support the verdict in this case, and a rational trier of fact could have found the essential elements of this crime beyond a reasonable doubt. The evidence, when viewed in a light most favorable to the State and after resolving all conflicts in favor of the prosecution, mandates the denial of Petitioner's claim. *See Machin v. Wainwright*, 758 F.2d 1431, 1435 (11th Cir. 1991) (the federal habeas court must presume that conflicting inferences to be drawn from the evidence were resolved by the trier of fact in favor of the prosecution). Merely because the evidence provided some support to Petitioner's theory does not warrant the granting of habeas corpus relief based on insufficient evidence. *See Wilcox v. Ford,* 813 F.2d 1140, 1143-44 (11th Cir. 1987); *Martin v. State of Alabama*, 730 F.2d 721, 724 (11th Cir. 1984) ("[t]he simple fact that the evidence gives some support to the defendant does not demand acquittal."). Consequently, under the *Jackson* standard, there was sufficient evidence to support the verdict, and this claim must be denied.[19]

---

[19]Further, relief must be denied based on section 2254(d). The claim was adjudicated on the merits by the Supreme Court of Florida. Petitioner has failed to demonstrate that the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Moreover, Petitioner has not shown that the adjudication of the claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

**E.      Claim Five**

Petitioner claims that the trial court erred in finding the aggravating factors that the crime was heinous, atrocious, or cruel and that the crime was committed to avoid arrest. According to Petitioner, the heinous, atrocious, or cruel aggravator was inappropriate because the victim had a blood alcohol level of 0.34 when he died rendering him unconscious and because the first blow to the victim would have rendered the victim incapable of perceiving the subsequent lethal attack. Petitioner states that the avoiding arrest aggravator was inappropriate because there was no evidence establishing that Petitioner killed the victim to avoid arrest.

*1.      Heinous, Atrocious, or Cruel Aggravating Factor*

The trial court found the heinous, atrocious, or cruel aggravating factor beyond a reasonable doubt, finding, among other matters, as follows:

> That the evidence in this case establishes that this murder was a conscienceless and pitiless crime which was unnecessarily torturous to the victim. The wounds were inflicted in a gruesome and hideous manner evincing extreme and outrageous depravity and exemplified by an utter indifference to the suffering of another and the desire to inflict a high degree of pain. The victim was alive and conscious and experienced fear, terror, pain, and a foreknowledge of death.

(Exhibit A-3 at 465.) The trial court found the aggravating factor that the crime was committed to avoid arrest based on statements made by Petitioner "in the context of the facts of this case [that were] sufficient to establish that [his] sole and dominant motive for this murder was the elimination of [the victim] as a witness." *Id*. at 462.

This issue was raised on direct appeal, and the Supreme Court of Florida affirmed:

> We find the HAC aggravating factor in this case to be clearly supported by the evidence. Colvin was hacked, cut, and stabbed a total of

38

nineteen times. Colvin suffered eleven incised and hack-type wounds to his face and skull, four stab wounds to his back and neck, three stab wounds to his chest, and one defensive wound to his hand. The blows to Colvin's head were administered with such force that the skull was fractured and a bone fragment was separated from the head. Colvin's cause of death could not be attributed to any one wound, but resulted from a loss of blood attributable to all of the wounds. Furthermore, despite his intoxication, Colvin was conscious during at least part of the attack. The blood spatter evidence demonstrates that Colvin's head was raised off the bed during the assault. The defensive wound to his left hand indicates that he struggled to defend himself from his attacker. Moreover, Cronin and Rogers both testified that Guzman confessed that Colvin was conscious when the attack began. In sum, we agree with the trial court that the murder was a conscienceless and pitiless crime that was unnecessarily torturous to the victim. Accordingly, we find competent, substantial evidence to support the trial court's finding that the HAC aggravating factor was proven.

*Guzman*, 721 So. 2d at 1160.

The Court will review this issue based on the record before the trial court and the evidence admitted. Dr. Terrance Steiner, a medical examiner, testified that, at the scene of the crime, he observed knife wounds on the back and side of the victim's head, blood splatter on the walls, and a skull fragment on the floor by the foot of the bed (Exhibit AA-19 at 1413.) The victim had "19 stab and incised and/or hack wounds to the body." *Id*. at 1414-15. The victim sustained eleven wounds to the face and scalp, which were hacking and incised injuries; three wounds to the chest; four wounds to the back; and one to the left index finger. *Id*. at 1424; 1428. The wound to the finger was a defensive wound. *Id*. at 1426-27. The weapon used was a knife or knife-like object that was "very heavy bladed." *Id*. The sword recovered at the scene, and which belonged to the victim, was consistent with the type of weapon that could have caused the type of wounds observed on the victim's body. *Id*. at 1415-16; 1418; 1447; 1459-60; 1481. Also, a survival knife like

the one owned by Petitioner could have inflicted other wounds.  *Id*. at 1416-17; 1429.[20]

According to Dr. Steiner, the victim was conscious and aware of what was happening when the assault began, and none of the wounds "would have been immediately fatal."  *Id*. at 1434.  The wound to the victim's chest area would have caused him to lose consciousness in twenty seconds to two minutes.  *Id*.  The victim died of blood loss and shock due to multiple stab and incised wounds.  *Id.*  at 1435.

N. Leroy Parker, a crime lab analyst for the Florida Department of Law Enforcement testified that, based on blood spatter patterns observed at the crime scene, the victim was moving about and in a defensive position during the attack.  (Exhibit AA-20 at 1594-95.)  Further, the victim's head was raised about one foot above the bed during a portion of the assault.  *Id*. at 1593-94.

On direct appeal, the Supreme Court of Florida pointed out that the facts of this case supported the heinous, atrocious, or cruel aggravating factor.  The Supreme Court of Florida found that this aggravating factor applied because the victim was hacked, cut, and stabbed a total of nineteen time and suffered eleven incised and hack-type wounds to the face and skull, four stab wounds to the his back and neck, three stab wounds to the his chest, and one defensive wound to his hand.  The victim was conscious during at least part of the attack, and the murder was a conscienceless and pitiless crime that was unnecessarily tortuous to the victim.  The Supreme Court of Florida has consistently upheld findings of heinous, atrocious, or cruel under similar circumstances.  *See, e.g., Finney v. State*, 660 So. 2d 674 (Fla. 1995); *Pittman v. State*, 646 So. 2d 167 (Fla. 1994); *Trotter v.*

---

[20]At the time of Petitioner's arrest, he had a survival knife in his possession.  *Id*. at 1506.

*State*, 576 So. 2d 691, 694 (Fla. 1990).

Petitioner has failed to demonstrate that the state court's rejection of this claim applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Therefore, this issue does not warrant habeas corpus relief.

2.    *Avoiding Arrest Aggravating Factor*

The trial court found the avoiding arrest aggravating factor had been established beyond and to the exclusion of any reasonable doubt based on evidence demonstrating that Petitioner's sold and dominant motive for the murder was the elimination of the victim as a witness. This issue was raised on direct appeal and affirmed:

> Guzman contends that the trial court erred in finding the avoiding-arrest aggravating factor. The trial court based its finding on several incriminating statements made by Guzman to Cronin. Guzman told Cronin that it would be easy to rob Colvin because he was drunk all the time and usually had money. Cronin further testified that Guzman stated to her that if he ever robbed anybody he would "have to kill them" and that "dead witnesses can't talk." We have found the avoiding-arrest aggravator in cases where the defendant's own statements demonstrate that the primary motive for the murder was the elimination of witnesses. *See, e.g., Remeta v. State*, 522 So. 2d 825, 827 (Fla. 1988) ("Anytime I seen a witness, I took him out, or at least shot him."); *Kokal v. State*, 492 So. 2d 1317, 1319 (Fla. 1986) ("[D]ead men can't tell lies."); *Pope v. State*, 441 So. 2d 1073, 1075 (Fla. 1983) (defendant stated prior to murder that he intended *1161 to eliminate the victim as a witness). We find the evidence in this case sufficient to support the trial court's application of the avoiding-arrest aggravating factor.

*Guzman*, 721 So. 2d at 1160-61.

The Court will review this issue based on the record before the trial court and the evidence admitted. Ms. Cronin testified that she had been working as a prostitute and was living at the Imperial Hotel in August 1991. (Exhibit AA-20 at 1635.) She met Petitioner

in early August 1991 and began a romantic relationship with him.  *Id*. at 1635-36.  Ms. Cronin was familiar with Mr. Colvin, the victim, and was aware that he drank alcohol "a lot."  *Id*. at 1638.  In fact, Petitioner mentioned to her that Mr. Colvin would be "easy to rob" because he "was drunk all the time and usually had money."  *Id*. at 1639.  Later, Petitioner told Ms. Cronin that "a dead witness can't talk" and that, if he ever robbed someone, he "would have to kill [that] person."  *Id*. at 1640-41.

On direct appeal, the Supreme Court of Florida found that the evidence was sufficient to support the avoiding arrest aggravating factor.  The Supreme Court of Florida found that this aggravating factor based on the incriminating statements made by Petitioner to Ms. Cronin.  In particular, Petitioner mentioned that Mr. Colvin would be easy to rob because he was drunk all the time; that, if he ever robbed someone, he would have to kill them; and that dead witnesses "can't talk."  The Supreme Court of Florida has upheld findings of avoiding arrest under similar circumstances.  *See, e.g., Remeta v. State*, 522 So. 2d 825, 827 (Fla. 1988); *Kokal v. State*, 492 So. 2d 1317, 1319 (Fla. 1986).

Petitioner has failed to demonstrate that the state court's rejection of this claim applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.  Therefore, this issue does not warrant habeas corpus relief.

**F.      Claim Six**

Petitioner states that there was prosecutorial misconduct when the State presented misleading evidence to the trier of fact.  He claims that the trial proceedings were tainted by the prosecutor's references to inadmissible evidence.  Petitioner identifies two instances

of prosecutorial misconduct.  First, on redirect examination of Ms. Cronin, the prosecutor elicited testimony about her polygraph examination:

> Q       Was that a polygraph you took, ma'am?
>
> A       Yes, it was.
>
> Q       You know what the result of the polygraph was?
>
> A.      No.

(AA-21 at 1778.)  Petitioner's counsel objected, and the trial court sustained the objection. *Id*. at 1779.

Second, during the direct examination of James Alfred Yarborough, Jr., the prosecutor elicited testimony about Petitioner's drug use:

> Q       Okay.  Had you personally had any contact with the defendant prior   to Mr. Colvin being killed?   Had you had any contact with this gentleman here?
>
> A       Yes, I met him once.
>
> Q       All right sir.  What was that about?
>
> A       At the time, I was living in room 109.  I had one of my little sons living with me.  And he approached me about drugs.   And I told him I didn't mess around.  And I left it at that.  Because I didn't.

(Exhibit AA-19 at 1477.)  Petitioner's counsel objected, and the trial court sustained the objection.  *Id*.

This claim was raised in Petitioner's amended Rule 3.850 motion and was denied as procedurally barred because it should have been raised on direct appeal.  The Supreme Court of Florida also found that the claims were procedurally barred.  *See Guzman*, 868 So. 2d at 510.

This  claim  is  procedurally  barred  because  the  Supreme  Court  of  Florida  so

43

determined in its opinion affirming the denial of Petitioner's first Rule 3.850 motion.[21]  The

denial on procedural bar grounds was a correct application of Florida law.   In the present

case, Petitioner has not shown either cause or prejudice that would excuse the default.

Likewise, Petitioner has not shown the applicability of the actual innocence exception.  A

review of the record reveals that the Petitioner is unable to satisfy either of the exceptions

to the procedural default bar.  Therefore, this claim is procedurally barred and is denied.

## G.    Claim Seven

Petitioner argues that his Eighth Amendment right against cruel and unusual

punishment could be violated because he might be incompetent at the time of his

execution.   He mentions that "the deterioration of his mental health resulting from

prolonged incarceration on death row can only contribute to the incapacity."  (Petitioner's

Memorandum of Law at 82.)

This claim was raised in Petitioner's amended Rule 3.850 motion, and the trial court

denied the claim as follows:

> At the evidentiary hearing, both partes agreed that this claim should
> be dismissed as being not ripe n this proceeding.  This Court agrees with the
> parties this claim should be dismissed as legally insufficient and not
> cognizable in a 3.850 proceeding.

(Trial Court's Order of July 19, 2001 at 25.)  The Supreme Court of Florida agreed with

Petitioner's concession that the issue was not yet ripe and found it to be without merit.

Since this claim is not yet ripe, it cannot be said that the state court's denial of this

---

[21]Although the Supreme Court of Florida also addressed the merits of the claim, this
claim still is procedurally barred.  In *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994)
("[W]here a state court has ruled in the alternative, addressing both the independent state
procedural ground and the merits of the federal claim, the federal court should apply the
state procedural bar and decline to reach the merits of the claim.").

claim was "contrary to, or involved an unreasonable application of, clearly established federal law" or was "based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d). As a result, Petitioner is not entitled to federal habeas relief on this claim.[22]

## V.    CONCLUSION

The Court finds that one of the claims raised in the instant petition has merit-Petitioner's claim that there was a *Giglio* and a *Brady* violation.  All other claims alleged by Petitioner have been determined to be without merit and must be denied with prejudice.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.     The Amended Petition for Writ of Habeas Corpus filed by James Guzman (Doc. No. 1) is **GRANTED** in part and **DENIED** in part.

2.     The Court determines that claims two through seven are without merit and that habeas relief is **DENIED** with prejudice with regard to those claims.

3.     The writ of habeas corpus with be conditionally **GRANTED** with regard to claim one for the reasons discussed above, within **NINETY (90) DAYS** from the date of this Order, unless the State of Florida initiates new trial proceedings in state court consistent with the law.

4.     The Clerk of the Court shall enter judgment accordingly and is directed to close this case.

---

[22]To the extent that Petitioner claims that there were cumulative errors entitling him to habeas relief, the Court finds that the claims relating to errors at trial could cumulatively, when considered in conjunction with the false testimony of Ms. Cronin and Detective Sylvester, provide an additional basis for granting habeas relief.

5.      As to claims two through seven, this Court should grant an application for certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   Petitioner has failed to make a substantial showing of the denial of a constitutional right.   Accordingly, a Certificate of Appealability is **DENIED** as to claims two through seven.

   **DONE AND ORDERED** in Orlando, Florida, this 17th day of March 2010.


        MARY S. SCRIVEN
        UNITED STATES DISTRICT JUDGE

Copies to:
sa 3/17
Counsel of Record